**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

GENOSOURCE, LLC,

        Plaintiff,

vs.

SECURA INSURANCE,

        Defendant.

No. 21-CV-86 CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.      BACKGROUND ............................................................................. 4

      A.    Procedural History .................................................................... 4

      B.    Factual History ........................................................................ 5

            1.    The Policy .................................................................... 5

            2.    The August 2020 Midwest Derecho ..................................... 6

            3.    The Aftermath and Estimates .............................................. 6

            4.    Paul Nilles' Photo Journal 1 .............................................. 8

            5.    Photo Journal 2 ........................................................... 10

            6.    Earnings & Expense Discussion, Computation, and Payment ..... 11

            7.    Photo Journal 3 ........................................................... 12

8.     The Restoration Period ................................................12

9.     Payments Through the Restoration Period...........................14

10.    One Year Provision and the Resulting Suit..........................15

II.    SUMMARY JUDGMENT STANDARD ...............................................18

III.   DISCUSSION................................................................21

       A.    Breach of Contract ...............................................22

             1.    Applicable Law ............................................23

             2.    Can Plaintiff Show it Performed all Terms and Conditions ........24

             3.    Can Plaintiff Show Breach .................................26

                   a.    The Restoration Period and Lost Income After
                         February 8, 2021 ....................................26

                   b.    Decreased Embryo and Bull-Related Income.................28

             4.    Can Plaintiff Show Damages ................................31

       B.    Insurer Bad Faith..................................................31

             1.    Applicable Law ............................................32

             2.    Can Plaintiff Show Defendant Had No Reasonable Basis to
                   Deny Benefits..............................................32

                   a.    Defendant Did Not Breach the Policy.........................33

                   b.    Reasonable Basis for Denying Coverage D Payments ......33

2

   c.  Coverage E Payments were Reasonable ......................34

   d.  Reliance on Experts for Extra Expense Computation .......35

   e.  Bad Faith does Not Flow.........................................38

  3. Can Plaintiff Show Defendant Knew or Should have Known its Denial was Baseless ......................................................40

IV. CONCLUSION ..............................................................41

This matter is before the Court on defendant's motion for summary judgment on plaintiff's petition at law ("petition") alleging breach of contract and insurer bad faith. (Docs. 2; 24). Plaintiff filed a timely resistance.[1] (Doc. 41). Defendant filed a timely reply. (Doc. 51). For the following reasons, the Court **denies** defendant's motion for summary judgment on Count I and **grants** defendant's motion on Count II.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. The Court will consider additional facts as they become relevant to its analysis.

### A. Procedural History

On August 9, 2021, plaintiff filed this suit in Benton County, Iowa, alleging breach of contract and bad faith. (Doc. 1, at 1). On September 24, 2021, defendant removed the action to the Northern District of Iowa before this Court based on diversity of citizenship. (Doc. 1); *see* 28 U.S.C. § 1441(b); 28 U.S.C. § 1332. On October 6, 2021, defendant provided its corporate disclosure statement (Doc. 6), and plaintiff followed suit on December 17, 2021 (Doc 11). On January 20, 2022, the Honorable Chief Magistrate Judge Kelly K.E. Mahoney determined the existence of diversity jurisdiction. (Doc. 12).

Defendant filed its answer to the petition on October 6, 2021. (Doc. 5). On July 18, 2022, defendant filed a motion for summary judgment under Federal Rule of Civil Procedure 56. (Doc. 24). On August 2, 2022, plaintiff filed for an extension of time to respond to the motion for summary judgment (Doc. 32), which defendant resisted on August 3, 2022 (Doc. 34). On August 4, 2022, the Court denied plaintiff's motion for

---

[1] In its resistance, plaintiff makes multiple statements directed at defendant that are not only unnecessary but lack decorum, such as "none of the arguments contained in Secura's run-on sentence" (Doc 43, at 19) and "Secura's nine-page discussion of Coverage D mostly drones on . . . and quibbles . . ." (*Id.*, at 18). Not only is this kind of treatment of an opposing party distasteful and a waste of the Court's time when reviewing the parties' briefs, but it is also not acceptable conduct before this Court.

extension of time. (Doc. 36). On August 4, 2022, plaintiff then filed an unresisted motion for extension of time (Doc. 37), which the Court granted on August 4, 2022. (Doc. 38). On August 22, 2022, plaintiff filed a timely resistance to defendant's motion for summary judgment and, the following day, a memorandum in support of the resistance. (Docs. 41; 43). Then, on August 26, 2022, defendant filed an unresisted motion for extension of time to file a reply, which the Court granted later that day. (Docs. 46; 47). On August 31, 2022, defendant filed a response to plaintiff's statement of additional facts (Doc. 48), and filed an unresisted motion for leave to file an overlength brief. (Doc. 49). On September 1, 2022, the Court granted defendant's motion to file an overlength brief (Doc. 50), and defendant's reply brief was filed September 1, 2022. (Doc. 51). Neither party requested oral argument on the motion for summary judgment. The Court finds a hearing is unnecessary.

### B. *Factual History*

#### 1. *The Policy*

Beginning September 2, 2019, and ending September 2, 2020, plaintiff was covered under an insurance policy called a Farm Owner's Protection Policy ("the Policy") through defendant. (Docs. 24-1, at 1; 41-1, at 1; 41-2, at 1). The Policy applied to plaintiff's farm premises ("the Property") located in Blairstown, Iowa. (Docs. 24-1, at 1; 41-1, at 1; 42-2, at 1; 48, at 2). The Property "consists of four (4) Loafing Barns (numbered 1 – 4 north to south); Milking Parlor; Hospital Barn; Commodities Shed; North and South Calf Barns; Feedlot; a pumping shed (which replaced two water towers); and "Main Street" connecting the Loafing Barns 1–4 to the Milking Parlor," "the holding pen, shop, hay shed, hoop barn, two houses, [and] sand lanes" and "other things." (Docs. 24-1, at 1-2; 41-1, at 1-2; 41-2, at 2; 48, at 3).

Plaintiff owns and operates a cattle breeding and dairy farming operation on the Property. (Docs. 41-1, at 1-2; 48, at 2). More specifically, plaintiff's dairy farming

business includes housing, caring for, and feeding around 3,200 milking cows, while its cattle breeding business includes genetic testing, intricate lab work, semen collection, and the sale and shipment of collected embryos and semen harvested from plaintiff's bulls. (Docs. 41-1, at 1-2; 48, at 1-2).

The Policy provides coverage for various structures on the Property under Coverage D, personal property under Coverage E, and includes a provision called Earnings & Extra Expense Endorsement. (Docs. 24-1, at 1; 41-1, at 2; 41-2, at 1; 48, at 3). The Earnings & Extra Expense Endorsement "was intended to provide adequate coverage for this specialized dairy and breeding operation." (Docs. 41-1, at 2; 48, at 3).

## 2. *The August 2020 Midwest Derecho*

On August 10, 2020, a derecho—a windstorm consisting of large scale, fast-moving severe thunderstorms of long duration—of unusual power and damage-potential hit the Midwest. (Docs. 24-1, at 2; 41-1, at 2; 41-2, at 2; 48, at 3-4, 5). Many areas throughout Iowa had resulting power outages lasting for many days and even weeks (Docs. 41-1, at 2; 48, at 3-4) and were impacted by an aggregated total of approximately $10,000,000,000 in damage, including to the Property. (Docs. 24-1, at 2; 41-1, at 2; 41-2, at 2; 48, at 3-4). The Property was covered in debris, sustained severe damage to almost every structure, and bulls and cattle were killed by the derecho, causing a temporary halt in plaintiff's business operations. (Docs. 41-1, at 3; 48, at 5). On August 10, 2020, after the storm passed, plaintiff reported an insurance claim to its local insurance agent, and the claim was received by defendant August 13. (Docs. 41-1, at 3; 41-2, at 2; 48, at 5, 6).

## 3. *The Aftermath and Estimates*

Shortly thereafter, on August 14, 2020, one of defendant's insurance representatives, Matt Hasz, contacted plaintiff about the claimed loss and later followed up via email. (Docs. 41-1, at 4; 48, at 5). Defendant retained three professionals, who

6

it calls experts to plaintiff's protestation, to compute and analyze the loss to the Property. (Docs. 24-1, at 2; 41-2, at 2). Defendant retained Jeff Berty as a certified public accountant, Hausch & Company ("Hausch") as an independent adjuster, and Paul Nilles as the claims consultant and valuation specialist. (*Id.*).

On August 19, 2020, defendant issued an advanced payment to plaintiff for $100,000, and on August 20, Hausch and Nilles went to the Property to inspect the premises. (Docs. 24-1, at 2; 41-2, at 2-3). Then, between about August 20, 2020, and September 7, 2020, plaintiff retained K-State Builders ("K-State") as contractor for the repairs, and by September 7, 2020, K-State had completed some repair estimates for Loafing Barns 1, 3, 4, the Feedlot, and the Commodity Shed, though plaintiff disputes that all estimates for necessary repairs to these structures were performed at this time. (Docs. 24-1, at 3; 41-2, at 3). Plaintiff asked K-State for estimates for costs and repairs to metal framing, girts and purlin repair, replacement of roof metal, and material disposal. (Docs. 41-1, at 4; 48, at 7). The parties dispute certain facts related to the estimates provided; plaintiff argues that each of the following estimates were only for certain repairs to each structure and were not an estimate for all repairs necessary for each structure, though defendant disagrees. (Docs. 24-1, at 3; 41-2, at 3-4). First, K-State estimated Loafing Barn 1 would require repairs of $182,500; second, estimated repairs to Loafing Barn 3 were $188,325; third, repairs to Loafing Barn 4 were estimated at $412,800; fourth, repairs to the Feedlot were estimated as $351,600; and fifth, repairs were estimated for the Commodity Shed at $73,200. (Docs. 24-1, at 3; 41-1, at 4-5; 41-2, at 3-4; 48, at 7-9).

Then, on September 16, 2020, K-State completed the following estimates: an estimated Calf Barn repair of $8,250 and an estimate for the Holding Pen and Breezeway of the Milking Parlor at $107,650. Defendant, again, states these are the estimates for repairs, while plaintiff states they are estimates for some of the repairs required by each

7

structure. (Docs. 24-1, at 3-4; 41-1, at 6; 41-2, at 4; 48, at 10). After plaintiff forwarded the estimates to defendant, on September 16, 2020, Nilles approved the K-State repair bids. (Docs. 24-1, at 4; 41-2, at 4). K-State also provided an estimate for Loafing Barn 2 of $68,300 that excluded the cost of garage doors, sprinklers, electrical, fans, and breezeway damage. (Doc. 41-1, at 6-7). At the same time, throughout September 2020, defendant issued: $48,406.72 for 30 perished cows on September 16; $39,260.11 for the Actual Cash Value of 94 lost calf hutches on September 17; $15,000 for a deceased bull on September 24; and $10,653.09 on September 28 for a lost laptop, portable gates, grain wagons, mailbox, bunker tires, and bunker plastic. (Docs. 24-1, at 4; 41-2, at 5).

Later, on October 1, 2020, K-State provided an estimate of $68,300 for repairs to Loafing Barn 2, which plaintiff says covers only certain repairs to the barn. (Docs. 24-1, at 4; 41-1, at 6). Other estimates were provided around this time by Development Resources of Iowa, Inc. for the following items: Roll-O-Matic agricultural curtains for Loafing Barns 1-4 for $112,982.11 and $482,920.03; the Hospital Barn for $46,505.71; Milking Parlor for $47,957.47; and the South Calf Barn for $20,084.58. (Docs. 24-1, at 4; 41-2, at 5). On October 6, 2020, defendant issued a second advance of $250,000, and on October 12 issued $58,656.15 for 66 cows killed by the derecho. (Docs. 24-1, at 4-5; 41-2, at 5). Defendant was aware at the time payments were issued, however, that plaintiff would be shifting to tunnel ventilation in the Milking Parlor and loafing barns instead of installing all agricultural curtains. (Docs. 41-1, at 8; 48, at 14).

### 4. Paul Nilles' Photo Journal 1

On November 11, 2020, Nilles went to the Property to inspect the progress of repairs to the various structures. (Docs. 24-1, at 5; 41-2, at 5). Nilles took photos for the Photo Journal to capture the progress at the Property. (Docs. 24-1, at 5; 41-2, at 5). At that time, the roof on the Commodity shed was finished. (Docs. 24-1, at 5; 41-2, at

6).  The parties dispute, however, the progress of repairs to other areas of the Property.[2] Plaintiff claims that during this visit, the demolition of Loafing Barn 1 was incomplete, while defendant claims that it had been demolished but was still being used for the cows. (Docs. 24-1, at 5; 41-2, at 6).  Further, plaintiff claims no repairs were done to Loafing Barn 2 as of Nilles' visit, but defendant claims the barn was generally repaired but waiting on new overhead doors and metal.  (Docs. 24-1, 5; 41-2, at 6).  The parties do not dispute, however, that both Loafing Barns 3 and 4 were receiving improvements[3] by the addition of a turn-around pad at each barn, which were not previously there.[4]  (Docs. 24-1, at 5; 41-2, at 6).  During the visit, Nilles noted in his Photo Journal that demolition of Loafing Barn 4 was complete, which plaintiff says is incorrect because demolition was not complete.  (Docs. 24-1, at 6; 41-2, at 6-7).  Although the progress of demolition is disputed, both parties agree the roof had not been repaired yet.  (Docs. 24-1, at 6; 41-2, at 7).  Supply chain issues during the Covid-19 Pandemic and after the derecho rendered plaintiff unable to obtain required replacement steel for the loafing barn roofs, so the parties settled on a galvanized steel to ensure the roofs would be on before winter.  (Docs. 41-1, at 7; 48, at 11).

On November 18, 2020, after Nilles' created Photo Journal 1, Nilles inputted the estimates from K-State and Roll-o-Matic into an initial Draft Scope and Estimate following review with plaintiff.  (Docs. 24-1, at 6; 41-2, at 7).  In the draft, Nilles

---

[2] Contractors had to work around the cattle who still had to be housed and given normal, necessary care, which exposed the cattle to the elements and impacted their health and the flow of business.  (Docs. 41-1, at 8-9; 48, at 15).

[3] The parties agreed plaintiff could make various improvements to the Property while repairs were ongoing so long as the improvements did not delay the repair project.

[4] Plaintiff states the additions did not delay the larger project because the contractor had not finished because of steel delays.  (Docs. 41-1, at 9; 48, at 15-16).

aggregated the estimates for the agricultural curtains to be put in Loafing Barns 1-4 as $112,982.11 and $482,920.03 and placed the ACV estimate of $1,696,664.61 in the draft. (Docs. 24-1, at 7; 41-2, at 8). The following day, defendant issued a $257,694.50 payment for lost silage, novemeal, soybean meal, mineral, soyplus, and clostat. (Docs. 24-1, at 7; 41-2, at 8). Then, on November 23, after defendant had received the first estimate, defendant issued two separate payments of $700,000 and $646,664.61 ($1,346,664.61[5] in total). (Docs. 24-1, at 7; 41-2, at 7).

### 5. Photo Journal 2

On December 2, 2020, Nilles again went to the Property to monitor progress and documented his findings in Photo Journal 2. (Docs. 24-1, at 7; 41-2, at 8). Nilles reported the following: the Heifer, or Calf, Barns were about 90 percent complete; and he and plaintiff discovered and identified additional damage to the siding and windows of the Milking Parlor. (Docs. 24-1, at 7-8; 41-2, at 9). Defendant states that Nilles and plaintiff agreed to a replacement style for the siding of the Milk Parlor, but plaintiff denies this, saying plaintiff was unable to find a contractor to repair and replace the siding at that time and was finally able to employ Garmin to do so in April 2021, which defendant approved. (Docs. 24-1, at 8; 41-2, at 9). Plaintiff was also unable to have a contractor install the fan and sprinkler system until April 2021, two months late, due to the contractor's other similar derecho-jobs. (Docs. 41-1, at 9; 48, at 16-17).

On December 15, 2020, Nilles updated his prior Scope & Estimate to include repairs related to Photo Journal 2, including the Milking Parlor, temporary sliding doors, and other ancillary payments. (Docs. 24-1, at 8; 41-2, at 9). The ACV estimate was changed to reflect an increased estimate of $1,731,977.31. (Docs. 24-1, at 8; 41-2, at

---

[5] This is equal to the first Scope & Estimate minus the aggregated $350,000 issued on August 19, and October 6, 2020. (Docs. 24-1, at 7; 41-2, at 8).

10).  On January 12, 2021, defendant issued a $74,790.20 payment to plaintiff to reflect the increased ACV estimate.  (Docs. 24-1, at 8-9; 41-2, at 10).

### 6. *Earnings & Expense Discussion, Computation, and Payment*

On December 3, 2020, Matt Hasz and Matt Simon discussed over the telephone the requirements for Earning & Extra Expense Coverage, an additional explanation of which defendant then sent plaintiff.  (Docs. 24-1, at 8; 42-1, at 9).  Plaintiff asked for a rolling distribution consistent with its rolling document production for the earnings and extra expense payments because Jeff Berty's computations as to various calculations would take time, to which defendant agreed.  (Docs. 24-1, at 9; 41-2, at 10).  Berty then issued a report calculating the Earnings & Extra Expense loss through October 31, 2020, at $524,024, and defendant issued payment in that amount on January 19, 2021.  (Docs. 24-1, at 9; 41-2, at 11).  On January 16, 2021, plaintiff provided defendant with other extra expense documents, which defendant claims included a claim for silage to refill the bunkers and not for lost feed, which plaintiff denies.  (Docs. 24-1, at 9-10; 41-2, at 10-11).  Defendant claims it already issued $257,694.50 on November 19, 2020, for silage lost under the personal property coverage, but plaintiff states this silage payment was not related to the losses in the January 16, 2021 submission.  (Docs. 24-1, at 10; 41-2, at 11).  Defendant denied the January 16 claim on January 27, 2021, which it asserts was for silage, but plaintiff states was not a claim for silage to fill the bunker.  (Docs. 24-1, at 10; 41-2, at 11).  Then, on March 11, 2021, Matt Simon made a claim under the Earnings & Expense Coverage for silage that was harvested after the derecho, according to defendant, but plaintiff denies this, stating Simon made the claim for additional derecho-caused expenses related to harvesting the silage.  (Docs. 24-1, at 10; 41-2, at 11).  On March 15, 2021, defendant denied the claim because crops are not covered property under the Policy entitled "Property not covered—Coverage E and F[.]"  (Docs. 24-1, at 10-11; 41-2, at 12).

11

### 7. *Photo Journal 3*

Nilles visited the Property again on January 18, 2021, to assess progress, and in defendant's telling but to plaintiff's denial, to assess coverage for a request to fill the bunkers beyond the feed lost. (Docs. 24-1, at 11; 41-2, at 12). Plaintiff had replaced the water towers with a completed pumping shed through the agreement of the parties, though defendant states this only replaced one of the towers. (Docs. 24-1, at 11; 41-2, at 13). Though defendant included temporary sliding doors costs for the Loafing Barns in a payment based off the January 15, 2020 Scope and Estimate, plaintiff had not installed the doors but instead had hay bales blocking the openings from wind. (Docs. 24-1, at 11; 41-2, at 13). Plaintiff characterizes the use of Loafing Barn 3 at this time as having not been returned to its pre-storm condition and thus was not in full use, though defendant states it was in full use during the visit. (Docs. 24-1, at 12; 41-2, at 13). Its turn-around pad was complete, as was the roof, but the permanent door and additional agricultural curtains still had to be replaced.[6] (Docs. 24-1, at 12; 41-2, at 13). Nilles stated the delay in replacing the remaining items was due to the turn-around redesigns, but plaintiff says this is incorrect because the turn-arounds did not cause a delay. (Docs. 24-1, at 12; 41-2, at 14). Loafing Barn 4's agricultural curtain had not been extended to the new turn-around, and though the Photo Journal implies the entire barn was in use, defendant claims the barn was being used but had not returned to its pre-derecho state. (Docs. 24-1, at 12; 41-2, at 14).

### 8. *The Restoration Period*

During Nilles' third visit, the west end overhead doors were expected for installation on or about January 25, 2021, and defendant sent plaintiff a document on

---

[6] The vendors informed plaintiff the curtain installation could likely not be completed until July 2021. (Docs. 41-1, at 7; 48, at 12-13 ). Loafing barns 3, 4, and the hospital had their curtains installed April 13, 2021, but installation in the hallways did not occur until June 8, 2021. (Docs. 41-1, at 9; 48, at 17).

January 25 re-stating the previous Earnings & Extra Expense coverage explanation and that the coverage for the entire derecho claim would terminate at the end of the "Restoration Period." (Docs. 24-1, at 12; 41-2, at 14). The document also stated defendant was aware the overhead doors would not be in until the week of February 1, 2021, so the Earnings & Extra Expense Coverage would apply until February 8, 2021. (Docs. 24-1, at 13; 41-2, at 14).

The Restoration Period, as defined in the Policy, is:

> the period of time:
> (1) Beginning immediately after:
>> (a) Damage or destruction to a building covered under this option caused by a Peril Insured Against under Coverage D; or
>> (b) A covered loss of "*livestock*" caused by a Peril Insured Against under Coverage E. This includes any covered loss caused by the suffocation peril if FPE 0031 Livestock Suffocation Endorsement is attached to this policy; or
>> (c) A covered loss of "*livestock*" caused by a covered loss under FPE 0095 Coverage for Livestock in the Care, Custody, or Control of an Insured; and
> (2) Ends on the earlier of:
>> (a) The date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>> (b) The date when "*farming*" operations are resumed at a new permanent location.

(Docs. 24-1, at 13; 41-2, at 15) (emphasis in original). On February 8, 2021, the permanent overhead garage doors were installed. (Docs. 24-1, at 13; 41-2, at 15). On June 25, 2021, plaintiff presented a PowerPoint presentation to defendant detailing its claims and asking that the Restoration Period end June 11, 2021, instead of February 8, 2021. Plaintiff believed February 8 could not be the end date under a fair Policy interpretation even though the Property on June 11, in plaintiff's telling, was still not at

a similar quality as it was pre-derecho. (Docs. 24-1, at 13; 41-2, at 15-16). From December 2020 through January 2021, plaintiff compiled its Earnings and Extra Expense losses to document a claim. (Docs. 41-1, at 11; 48, at 19). On June 14, 2021, the parties discussed the Earnings & Extra Expense Restoration Period, and on July 19, defendant sent plaintiff correspondence explaining defendant's position was, based on Nilles' visits and the "elective enhancements"—which Nilles knew about—to the Property, the Restoration Period would not be extended to June 11. (Docs. 24-1, at 13-14; 41-2, at 16). The following elective enhancements were made to the Property:

> (a) Loafing Barn # 1 (extending the west wall 6 feet; enclosing the north and south walls with half polycarbonate and concrete; extending the east wall 30 feet; installed fans on the east end wall); (b) Loafing Barn #2 (extending the west wall 30 feet, enclosing north and south walls with half polycarbonate and concrete; extending the east wall 30 feet; installed fans on the east end wall); (c) Loafing Barn #3 (extending the west wall 30 feet; enclosing north and south walls with half polycarbonate and concrete; extending the east wall 30 feet; installing fans on the east end wall); (d) Loafing Barn #4 (extending the west wall 30 feet; enclosing the north and south walls with half polycarbonate and concrete; extended the east wall 30 feet; installed fans on the east end wall); (e) "Main Street" breezeway (replaced curtains with steel and polycarbonate); and (f) Milking Parlor (replaced east air curtain with an end wall and fans; added storage room).

(Docs. 24-1, at 14; 41-2, at 16). Defendant referenced an industry standard timeline as the basis of denial, though it provided no citations and did not identify any dairy farming or herd health experts in its review or decision. (Docs. 41-1, at 12; 48, at 21-22).

### 9. Payments Through the Restoration Period

On March 22 and 26, 2021, defendant requested records from plaintiff for use in determining coverage compensability under Earnings & Extra Expense coverage, which defendant claims plaintiff sent on May 27, 2021, but which plaintiff says was unrelated. (Docs. 24-1, at 15; 41-2, at 17). Plaintiff says the email it sent was instead about the

herd nutritionist's determination of food increase expenses to combat the housing conditions plaintiff's livestock were in after the derecho. (Docs. 24-1, at 15; 41-2, at 17). On May 27, Berty calculated the loss of earnings and extra expenses through December 31, 2020, at $886,422, and defendant issued payment of $362,398 on June 4, 2021, based on the finding less the $524,024 paid on January 19, 2021, for losses through October 31, 2020. (Docs. 24-1, at 15; 41-2, at 17). On July 8, having decided[7] that the Restoration Period ended February 8, Berty calculated a final loss of earnings and expenses of $1,108,710 through February 8, 2021, and defendant issued the remaining $222,288 on July 15, 2021. (Docs. 24-1, at 15-16; 41-2, 18).

### 10. One Year Provision and the Resulting Suit

The Policy provides that in suits against defendant, "No action can be brought unless the policy provisions have been complied with and the action is started within one year (in Minnesota, two years) after the date of loss. (Docs. 24-1, at 16; 41-2, at 18-19). Defendant characterizes this to mean all provisions must be complied with and sent plaintiff a letter stating that plaintiff was obligated to "return documentation within one year of the date of loss per the Policy[,]" while plaintiff says that "all" is not accurate, nor is it obligated to return everything within the year. (Docs. 24-1, at 16; 41-2, at 18-19).

On July 27, 2021, plaintiff requested an extension of the one-year deadline to provide defendant with all repair estimates and invoices after Hasz informed them that was a Policy requirement, which plaintiff says was incorrect. (Docs. 24-1, at 16; 41-2, at 19). Defendant asked Nilles to review the list of items from plaintiff that it claimed warranted an extension, and Nilles responded the same day, July 28, 2021, that the list of items would not prohibit use of the facilities and did not require an extension. (Docs.

---

[7] Plaintiff emphasizes defendant decided this date, and it was not "established." (Docs. 24-1, at 15; 41-2, at 18).

24-1, at 16; 41-2, at 19). After an exchange between the parties from July 28 through August 5, 2021, about the extension request, defendant declined to extend the date on August 6, 2021. (Docs. 24-1, at 17; 41-2, at 19). During the exchange, Hasz communicated with Nilles who answered questions and claimed some of the invoices were not related to the derecho damage and included elective enhancements. (Docs 24-1, at 17; 41-2, at 19-20). Plaintiff sent invoices to defendant on August 6 and 9, 2021, and defendant, in turn, sent them to Nilles who claimed some of the August 9 invoices were unrelated to storm damage and were instead relevant to the elective enhancements. (Docs. 24-1, at 17-18; 41-2, at 20). On August 9, 2021, Nilles forwarded a spreadsheet of all received invoices to defendant, and later that day or those following, Nilles was informed plaintiff had filed suit on August 9 in state court and suspended work on the claim. (Docs. 24-1, at 18; 41-2, at 21). On August 13, 2021, defendant issued a $540,291.11 payment to plaintiff for the Calf Barn, Feedlot, Commodity Shed, Milking Parlor & water tank, dwelling, personal property, and extra expense coverage. (Docs. 24-1, at 18; 41-2, at 21).

Defendant inadvertently omitted $7,804 from the August 13 payment and issued such additional payment March 15, 2022, along with a denial of compensability for plaintiff's livestock trailer, citing a policy exclusion, which it claims to have relied upon. (Docs. 24-1, at 18-19; 41-2, at 21-22). The provision reads: "a. automobiles, trucks, motorcycles, trail bikes, mopeds, snowmobiles, al-terrain vehicles, mobile homes, house trailers, vehicles licensed for road use (other than wagons and trailers designed for *farming* purposes and used principally on the *insured premises*), watercraft, *aircraft*, *unmanned aircraft*, sawmills and/or their equipment, tires, and parts of any of these[.]" (Docs. 24-1, at 19; 41-2, at 22) (emphasis in original).

Nilles reviewed his December 15, 2020 Scope & Estimate and updated it around May 9, 2022, and sent it to defendant around May 11, 2022. It contains the following additions:

> South Calf Barn fans ($15,067); South Calf Barn overhead doors ($16,105); North Heifer Barn fans ($15,067); Feedlot A/C units ($2,524.81); Feedlot doors ($2,794); Loafing Barn 1 concrete ($3,000); Loafing Barn 1 fans ($6,295.26); Loafing Barn 1 sprinklers ($5,942.40); Loafing Barn 1 roll-up doors ($8,902.71); Loafing Barn 1 overhead doors ($3,169.78); Loafing Barn 2 rollup doors ($8,902.71); Loafing Barn 2 overhead doors ($3,169.78); Loafing Barn 3 fans ($6,295.26); Loafing Barn 3 sprinklers ($5,942.40); Loafing Barn 3 roll-up doors ($8,902.71); Loafing Barn 3 overhead doors ($3,169.78); Loafing Barn 4 fans ($6,295.26); Loafing Barn 4 sprinklers ($5,942.40); Loafing Barn 4 roll-up doors ($8,902.71); Loafing Barn 4 overhead doors ($3,169.78); Milking Parlor pump room HVAC unit ($1,053.33); Milking Parlor heater unit HVAC unit ($9,119.07); Electrical ($105,333.30).

(Docs. 24-1, at 20; 41-2, at 23-24). As such, on May 19, 2022, defendant issued a $246,859.69 payment to reflect the additional $252,066.45 minus the previously issued temporary door payment, though plaintiff rejected the May 19 payment because defendant stated the payment was for all outstanding payments from the loss, but plaintiff believed it did not cover all additional losses. (Docs. 24-1, at 21; 41-1, at 13; 41-2, at 24; 48, at 25-26). Though plaintiff returned the check, defendant states it reissued the check at an undisclosed time upon informing plaintiff that cashing the check would not waive any rights. (Docs. 41-1, at 13; 48, at 25-26).

The Insurance Policy contains an endorsement for "direct physical loss from any external cause" unless otherwise excluded; and "[a]ll policy provisions applicable to Coverage E . . . apply to this endorsement." (Docs. 24-1, at 21; 41-2, at 24). There is also a policy limit of liability called Reproductive Materials Coverage Endorsement limiting coverage to $100,000. (Docs. 24-1, at 21; 41-2, at 24). When plaintiff served

a response to defendant's written discovery, it claimed $94,345.12 for "lost embryo sales" and "$784,000" for "lost bull production," but there were previously no requests under the Reproductive Materials Coverage Endorsement. (Docs. 24-1, at 21; 41-2, at 25). Defendant claims it was not aware of this claim until plaintiff responded to Interrogatory 14, but plaintiff says that shortly after the derecho, plaintiff made an Earnings & Extra Expense claim for lost income from embryo and bull loss. (Docs. 24-1, at 21; 41-2, at 25). Defendant claims, and plaintiff denies, that plaintiff did not provide prompt notice under the Reproductive Materials Coverage Endorsement for the bull and embryo claim. (Docs. 24-1, at 21-22; 41-2, at 25).

Finally, plaintiff, in discovery, stated it believes the Restoration Period should be extended to December 3, 2021, and it only offered an initial June 11, 2021 date as a compromise. (Docs. 24-1, at 22; 41-2, at 25-26). The buildings like the loafing barns could not have been fully operational—commensurate with pre-storm conditions—until buildings were framed in, had doors, fans, sprinklers, and doors that were installed and hooked up to the electricity, which did not all occur before the end of the year because of delays and supply chain issues. (Docs. 41-1, at 7, 10; 48, at 11, 17). Further, reproductive losses could not be measured within the year period because of the reproductive cycle. (41-1, at 11; 48 , at 20).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV.

P. 56(c)(3).  Even so, the moving party does not meet its burden by simply providing a massive record, and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331; *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993).  But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56 burden of production.  First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim.  *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018).  Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.  *Id.*

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation marks omitted).  In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).  A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).  Rather, a "court's function is to determine whether a dispute about

a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

Here, plaintiff bears the burden of persuasion on all claims asserted. Defendant, as movant for summary judgment, bears the burden of production. Thus, in each part of its analysis, the Court will begin by determining whether defendant meets its initial burden. If not, the Court must deny summary judgment. If so, the Court will then determine whether plaintiff raises a genuine dispute of material fact.

## III.    DISCUSSION

Plaintiff's petition contains two counts alleging defendant (1) breached the Policy—i.e., the parties' contract and that (2) defendant acted in bad faith when it denied certain coverage claims made as a result of the derecho-damage. (Doc. 1, at 1).

Specifically, in Count I, plaintiff alleges that although plaintiff has performed, in its telling, all terms and conditions required under the Policy, defendant has: (1) not remitted full compensation owed for farm structures covered by Coverage D of the Policy; (2) has not covered losses after February 9, 2021, related to a provision covering Earnings & Extra Expenses; (3) refused to cover losses under the Earnings & Extra Expense Endorsement, such as labor expenses, cow feed, and substitute equipment used to farm as closely as possible to operations occurring before the derecho-damage; and (4) has failed to promptly respond to plaintiff's claims for coverage under both the Earnings & Extra Expense Endorsement and Coverage E. (Doc. 1-2, at 9-10). All these Policy breaches, plaintiff alleges, have resulted in damages. (*Id.*, at 10). Defendant responds, asserting that it paid all that it is obligated to pay under Coverages D, E, and Earnings & Extra Expense coverage. (Doc. 24, at 1).

In Count II, plaintiff alleges defendant committed insurer bad faith. (Doc. 1-2, at 10-11). Namely, defendant, according to plaintiff, has breached the duty to act in good faith through the following bad faith actions: defendant (1) waited a lengthy period of

time to deny certain claims and later attempted to settle for far less than what was owed under the claims; (2) failed to offer a reasonable extension of the one-year deadline for completion of repairs, given the circumstances; and (3) failed to respond promptly to plaintiff's coverage claims under both Coverage E and the Earnings & Extra Expense Endorsement. (*Id.*). Further, plaintiff alleges defendant had no reasonable basis to deny the above claims, and defendant knew it had no reasonable basis to deny the claims. (*Id.*, at 11). Defendant argues it reasonably relied on the Policy's language, expert reports and opinions, and plaintiff's decision to make "elective enhancements" during the repairs in evaluating the claims and thus had a reasonable basis when it denied certain claim coverage. (Doc 24, at 2).

The parties' arguments in support and in resistance of defendant's motion are fact-intensive. The Court's discussion of the facts at this stage is not intended to be exhaustive. The Court analyzes the undisputed facts or disputed facts, as appropriate, to determine the claims on which a reasonable jury could find in plaintiff's favor. As such, the Court does not discuss or reach all of plaintiff's arguments or evidence in support thereof.

### A. Breach of Contract

Defendant argues that it has fully complied with the terms of the Policy and consequently is not subject to a claim of breach. More specifically, defendant argues that it correctly paid all sums owed under: (1) Coverage D; (2) Coverage E; and (3) Earnings and Extra Expense coverage. (Doc. 28, at 5-20). Further, it argues plaintiff did not fulfill its obligation to provide notice, and plaintiff has already been paid everything it is owed. (*Id.*, at 19-20; 24, at 1).

Plaintiff argues that defendant committed breach because it underpaid plaintiff's claim. (Doc. 43, at 16-28). Specifically, defendant breached by not paying lost income after February 8, 2021, including losses from embryo and bull sales; not covering

plaintiff's increased harvest; not covering the cost of supplemental feed provided in lieu of inadequate shelter; and by not paying for the cost of labor and equipment used to clean up post-derecho debris. (*Id.*).

The parties agree, however, that a contract—the Policy—existed and what the terms are on paper, though they dispute the terms and conditions as far as what claims would be covered, resulting in the disagreement related to the remaining three elements of breach. (Docs. 28; 43; 51).

For the following reasons, the Court finds (1) defendant meets its initial burden as to all three elements in dispute, but plaintiff shows a genuine dispute of material fact as to all the elements, making summary judgment inappropriate.

### 1. *Applicable Law*

To prevail on a breach of contract claim under Iowa law, a plaintiff must show:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the [defendant]'s breach of the contract in some particular way; and (5) that [the plaintiff] has suffered damages as a result of the breach.

*Cross Over, LLC v. Raph Assocs., Inc.*, No. 19-CV-3040-CJW-MAR, 2020 WL 6531237, at *3 (N.D. Iowa, June 23, 2020) (quotation omitted); *see Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co.*, 823 F.3d 1161, 1165 (2016). A contract can be expressed in words or implied from conduct. *Ringland-Johnson-Crowley Co. v. First Centr. Serv. Corp.*, 255 N.W.2d 149, 152 (Iowa 1977).

Under Iowa law, all contracts include an implied duty of good faith and fair dealing. *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014); *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 456 (1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the

justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a.

### 2.    Can Plaintiff Show it Performed all Terms and Conditions

There is a genuine issue of material fact as to whether plaintiff fulfilled its obligations under the terms and conditions of the Policy.  Defendant asserts plaintiff needed to provide notice of its claims as a condition to receive coverage for each line item. (Doc. 28).  In support, it points to the fact that although plaintiff claims $2,064.97 for the Hoop Barn, it never provided defendant with an invoice that any work was performed on the Hoop Barn.  (*Id.*, at 12).  It also states that although plaintiff claims $8,367 for the Shop, it did not base this amount on an invoice, but instead on a proposal. (*Id.*, at 12).  Further, plaintiff never provided evidence that any work was performed on the Shop, nor that the Shop was damaged.  Also, it states, any coverage for the Shop's allegedly damaged doors would have been accounted for in the Nilles' Scope and Estimates.  (*Id.*, at 12-13).

In response, plaintiff does not address lack of timely notice related to the Hoop Barn and Shop.  Instead, it states in relation to relevant pages of defendant's briefing that the entire monetary disagreement under Coverage D relates to the Dairy Complex and an alleged short pay for related repairs.  (Doc. 43, at 18).  It says that from pages 5-14 of its memorandum, defendant debates invoices to facilities other than the Dairy Complex. (*Id.*).  Plaintiff's argument here does not address this element of breach despite directly referencing and responding to some of defendant's argument on this element.

Defendant also argues plaintiff did not comply with the policy provisions under the Reproductive Material Coverage Endorsement.  (Doc. 28, at 12-13).  It supports this by saying that plaintiff never made these claims until doing so in this lawsuit, despite the

24

Policy's requirement of prompt notice. (*Id.*, at 19; 51, at 7-8). Even if plaintiff had provided prompt notice, defendant states the provision is limited to $100,000 in claims, and plaintiff claims $878,345.15. (Doc. 28, at 19-20).

Plaintiff responds that its coverage claims for losses related to embryo and sperm sales and resulting lost earnings were not made under the Reproductive Material Coverage Endorsement; they were made under E&EE Coverage. (Doc. 43, at 24-25). It supports this assertion by pointing to coverage language: the former coverage only applies to "direct physical loss" of sperm and embryos, but the latter provision covers lost earnings resulting from direct physical loss or damage to buildings covered by the Policy. (*Id.*). Plaintiff claims the loss of embryos and sperm, which it sells, falls under the E&EE provision and is not capped at $100,000. (*Id.*, at 25). It states in support that it earned $97,065 less in embryo sales and $784,000 less in bull sales than in prior years from the reduced genomic ranking of the reproductive materials resulting from changed, worsened conditions on the livestock after the derecho. (*Id.*, at 24-25). Thus, the claim here is for lost earnings resulting from direct physical loss or damage to the covered building where the livestock generating these reproductive materials were housed. (*Id.*).

Further, plaintiff asserts there is no one-year provision. (Doc. 43, at 25). It also states that the Policy requires plaintiff to give prompt notice only when defendant requests loss documentation, which defendant never requested related to these claims. (*Id.*, at 25-26). Even if it needed to provide prompt notice without a loss documentation request, plaintiff argues it was relieved of that obligation on January 25, 2021, when defendant repudiated its obligation by notifying plaintiff it would not cover lost income after February 8, 2021. (*Id.*).

Though defendant meets its initial burden here, plaintiff shows there is a genuine issue of material fact as to whether it fulfilled its obligations. There are genuine issues

of material fact related not only to whether plaintiff fulfilled its obligations under the contract but also what some of those obligations were, given the alleged breach.

Thus, the Court finds there is a genuine question as to whether the plaintiff performed all terms and conditions it was obligated to perform under the Policy.

### 3. Can Plaintiff Show Breach

Second, a reasonable jury could find that, based on the undisputed facts, defendant breached the Policy agreement. Here, plaintiff alleges breach under two provisions of the Policy: (1) failing to pay sums allegedly owed under Coverage D, and (2) failing to pay sums allegedly owed under the E & EE Coverage. (Doc. 43, at 16-28).

The E & EE Coverage states, in relevant part of Section I.1.d, that the restoration period ends upon the earlier of: "(a) [t]he date when the property *should* be repaired, rebuilt or replaced with reasonable speed and similar quality; or (b) [t]he date when "*farming*" operations are resumed at a new permanent location." (Doc. 24-2, at 97) (first emphasis added). Plaintiff advances several theories of breach under E & EE Coverage, including that defendant failed to pay, as (plaintiff argues is) required by the policy: (1) lost income after February 8, 2021, (2) decreased embryo and bull-related income, (3) extra expenses related to harvesting corn, (4) extra expenses related to "specialized additional feed," and (5) labor expenses. (Doc. 43, at 20-21).

### a. The Restoration Period and Lost Income After February 8, 2021

Defendant argues that the restoration period ended on February 8, 2021, because: (1) the facilities were of similar quality to their pre-derecho condition on February 8, 2021; and (2) any repairs that occurred later than that date would have been completed earlier if not for plaintiff's "elective enhancements," and that, consequently, plaintiff's claim for $1,744,626.59 for lost milk revenue after February 9, 2021, is not owed by defendant. (Doc. 28, at 17-19). In support of its assertion that the facilities were in similar quality to their pre-derecho condition on February 8, 2021, defendant points to

26

the Nilles Report to demonstrate that "[t]he structures were in full use" by February 8, 2021. (Doc. 28, at 18). Specifically, defendant asserts that certain photos show that, on February 8, 2021: (1) "the west end of Loafing Barn #1 had been demolished for repairs, however cows were still using the entire length of the barn," (Doc. 24-1, 5; *accord* Doc. 24-2, at 210-11); (2) "Loafing Barn #2 was generally repaired, but was waiting on new overhead doors and metal," (Doc. 24-1, 5; *accord* Doc. 24-2, at 212); (3) "Loafing Barn #3 was in full use," (Doc. 24-1, at 12; *accord* Doc. 24-2, at 252); and (4) "Loafing Barn #4 was in use," (Doc. 24-1, at 12; *accord* Doc. 24-2, at 257). Defendant also asserts that, by February 8, 2021, the "structure was complete such that the wind was off the cows." (Doc. 28, at 18; *accord* Docs. 24-1, 11-12; 24-2, 248).

In support of its assertion that the date on which repairs *should* have been completed and the date in which they *were* completed are not in accord because of plaintiff's "elective enhancements," defendant points to the Nilles Report. (Doc. 24-2, at 251) ("[T]he curtains and doors were not installed due to the redesign of the West end turn arounds."). Defendant also points to plaintiff's response to interrogatory number thirteen. (Docs. 24-1, at 14 ("The elective enhancements made to the property include the following . . . ."); 24-2, at 163-67).

The Court finds that defendant has met its initial burden of production by identifying the relevant portions of the record that show a lack of genuine dispute.

Plaintiff argues, in response, that: (1) the facilities were not of similar quality to their pre-derecho condition on February 8, 2021; and (2) any delays to repairs that did occur were not the product of plaintiff's "elective enhancements" but instead were caused by labor shortages and supply chain issues, and that, consequently, the date upon which repairs should have been completed was later than February 8, 2021. (Doc. 43, at 23). In support of its assertion that the facilities were not of similar quality of their pre-derecho condition on February 8, 2021, plaintiff points to photographs of the facilities sent in an

email dated February 25, 2021, which—plaintiff argues—shows the "poor condition that the buildings were in" on February 25, 2021. (Docs. 41-9, 36-39; 43, at 21-23).

Further, in asserting that any delays to repairs of the facilities were not the product of plaintiff's enhancements, plaintiff points to the declaration of Merlin Ramer, who asserts that the expansion of plaintiff's structures "caused no delay and was recommended" by Mr. Ramer to "spe[e]d [up] the repair process." (Doc. 41-7, at 19). Plaintiff also points to the declaration of Matt Simon, who asserts that the "rebuilding efforts were hampered by labor shortages and supply chain issues emanating from the global pandemic" and were exasperated by the derecho. (Doc. 41-7, at 2). This undisputed evidence satisfies plaintiff's burden.

The Court finds that there is a genuine issue of material fact as to when the Restoration Period closed. The precise date at which the Restoration Period closed is material: it determines whether defendant was required to compensate plaintiff for its resulting losses under the E& EE Coverage after February 8, 2021, and, consequently, whether defendant's failure to do so constituted breach of the Policy. Further, the date at which the Restoration Period closed is the subject of a genuine issue: a reasonable jury, presented with the portions of the record identified here, could find that the date at which repairs should have been completed—that is, the date at which the restoration period closed—was later than February 8, 2021.

### b. Decreased Embryo and Bull-Related Income

Defendant argues that plaintiff's $878,345.15 claim under the Reproductive Material Coverage Endorsement is not owed—and, consequently, that defendant did not breach the Policy for its lack of payment of—because plaintiff failed to comply with the relevant provisions for the endorsement. (Doc. 28, at 19). Specifically, defendant argues that plaintiff failed to: (1) give a timely notice of the loss; (2) "fail[ed] to preserve or photograph the lost property"; and (3) "otherwise fail[ed] to submit supporting

documentation." (*Id.*). Further, defendant asserts that, even if plaintiff had complied with the terms of the Policy in asserting its claim, the maximum available coverage under the endorsement is only $100,000—far below plaintiff's $878,345.15 claim. (*Id.*, at 19-20).

Plaintiff asserts that defendant failed to comply with the terms of the Policy and points to the terms of Coverage E, which are applicable to the endorsement. (Doc. 24-2, at 56 ("All policy provisions applicable to Coverage E . . . apply to [the Reproductive Material] [E]ndorsement.")). Coverage E provides, in relevant part, that—in addition to the applicability of the one-year policy—after loss, plaintiff must "give prompt notice to [defendant]" of the loss; "prepare an inventory of damaged personal property, showing the quantity, description, actual cash value, and amount of loss"; and, "as often as [defendant] reasonably require[s,] . . . show the damaged property." (*Id.*, at 121).

In further support of its assertion that plaintiff breached the Policy in its claim under the Endorsement, defendant argues that plaintiff's claim was untimely. Defendant points to plaintiff's response to interrogatory number 14, in which plaintiff lists under the heading "Amounts Not Paid" a line item for "Lost Embryo Sales $97,065.00" and one for "Lost Bull Production $784,000." (Docs. 28, at 19; 24-1, at 21; 24-2, at 168). Defendant asserts that this interrogatory response, which came about twenty-one months after the derecho, was the time at which defendant was made aware that plaintiff was making a claim under the Endorsement and points to the Niemann Report. (Docs. 28, at 19; 24-1, at 21; 24-2, at 189 ("Answer #14 contained a claim for 'lost embryo sales'. . . and a claim for 'lost bull production' . . . . This was the first notice of these alleged damages in the materials reviewed.")). Defendant asserts that this interrogatory response did not provide "prompt notice" of plaintiff's claim under the Endorsement and that, consequently, no coverage was owed thereupon. (Doc. 28, at 19). Defendant further argues that, under the terms of the Policy (specifically, a so-called "one-year provision"),

plaintiff was required to bring suit against defendant within one year after loss. (Doc. 28, at 19-20; Doc. 24-2, at 123 ¶ 11 ("No action can be brought unless the policy provisions have been complied with and the action is started within one year . . . after the date of loss.")). Defendant argues that because plaintiff brings this claim more than one year after the date of loss, that coverage under the Endorsement is not owed.

Plaintiff argues that defendant breached the Policy by refusing to compensate plaintiff's decreased bull embryo and bull sales. (Doc. 43, at 23-25). Specifically, plaintiff asserts that: (1) defendant improperly categorizes plaintiff's claim under the Endorsement when, instead, the claim correctly comes under the E&EE Coverage; and (2) that plaintiff's claim was—and remains—timely. (*Id.*).

Plaintiff states that the lost embryo and bull sales were compensable under the E&EE Coverage and directs the Court to the affidavit of Tim Rauen, wherein Rauen reports that plaintiff's "embryo sales decreased $97,065 year over year" and that "the bulls . . . [plaintiff] birthed and sold from July 2021 to February 2022 . . . had a much lower genomic ranking than bulls produced in the prior years, costing [plaintiff] $784,000 in lost income." (Doc. 41-6, at 388).

Then, arguing plaintiff's claim was not untimely, plaintiff claims that the "one-year provision" does not require claims to be fully documented within one year of the loss. (Doc. 43, at 23-25). It also points to the Policy, arguing it requires prompt notice only when defendant requests loss documentation, which defendant never requested related to these claims, in plaintiff's telling. (*Id.*, at 25-26). Also, plaintiff argues it was relieved of that obligation—request or not—on January 25, 2021, when defendant notified plaintiff it would not cover lost income after February 8, 2021, despite, in plaintiff's telling the Restoration Period ending later. (*Id.*). Plaintiff asserts this was repudiation of defendant's obligation because the Restoration Period did not occur on February 8, 2021. (*Id.*).

In sum, the Court finds the undisputed evidence could support a jury finding that there was a breach on these allegations and undisputed facts, and thus, the Court finds a genuine issue of material fact as to this element of the claim.

### 4. Can Plaintiff Show Damages

Third, a reasonable jury could find damages resulted from the breach based on the undisputed facts at issue. Defendant does not meet its initial burden on this element because it provides no specific argument and produces no evidence as to whether plaintiff can show damages. Thus, because defendant has not met its burden, the Court finds there is a genuine issue of material fact as to the element of damages that could lead a jury to find damages resulted from the alleged breach.

For these reasons, the Court **denies** summary judgment on plaintiff's breach of contract claim.

### B. Insurer Bad Faith

Defendant asserts that it had multiple bases to deny coverage, relying on expert opinions in denying various claims. (Doc. 28, at 20-25). Even if defendant relied on the experts in error in denying additional payments, defendant asserts it had no knowledge or reason to know the experts were incorrect. (Docs. 28, at 26; 51, at 14).

Plaintiff argues that defendant's conduct constitutes bad faith because—as plaintiff asserts—defendant had no reasonable basis to deny two of plaintiff's claims: a claim under Coverage D for the Dairy Complex repairs, which plaintiff alleges was underpaid by $1,406,370.07; and a claim under the E&EE Coverage, which plaintiff alleges was underpaid by $2 million. (Docs. 2, at 10-11; 43, at 27). Further, it claims defendant had reason to know denying the claims was baseless because it provided evidence to defendant throughout the claims process and because Nilles was unqualified, which defendant should have known. (Doc. 43, at 31-32).

### 1. *Applicable Law*

Under Iowa law, a party alleging insurer bad faith must show that (1) "the insurer has no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." The first element in analyzing bad faith is objective, while the second element is a subjective inquiry. *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 253 (Iowa 1991). *Thornton v. Am. Ins. Co.*, 897 N.W.2d 445, 461-62 (Iowa 2017). Iowa law recognizes insurer bad faith because "traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct[,]" particularly because insurance contracts and policies are often adhesion contracts as the result of unequal bargaining power. *Thornton*, 897 N.W.2d at 462; *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). Further, courts treat claims that are "fairly debatable" as allowing the insurer to debate the claim—when there is an actual, logical disagreement of fact or law that serves as the basis for the disagreement, a court will not find bad faith. *Reuter*, 469 N.W.2d at 253; *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473-74 (Iowa 2005). Further, an improper investigation by itself "is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Reuter*, 469 N.W.2d at 254-55. Even if the insurer does not have a reasonable basis to deny the claim, however, a court will not find bad faith unless the insurer knew or should have known that the basis for denying a claim was unreasonable. *Bellville*, 702 N.W.2d at 474. A negligent or sub-par investigation into a claim or evaluation is considered in evaluating whether the insurer should have known the denial was unreasonable. *Id.*

### 2. *Can Plaintiff Show Defendant Had No Reasonable Basis to Deny Benefits*

First, the undisputed facts could lead a reasonable jury to conclude that defendant had a reasonable basis to deny the benefits of coverage for various claims it denied.

Thus, the Court finds there is no genuine issue of material fact as to the issue of denial grounded in a reasonable basis, and the undisputed facts provided could not result in a jury finding in favor of plaintiff.

Defendant articulates five reasons why it had a reasonable basis to deny payments to plaintiff in excess of $4,104,790.18 already paid: (1) defendant did not breach the Policy; (2) even assuming breach, Coverage D payments were grounded in the Nilles Report; (3) even assuming breach, Coverage E payments were agreed-upon between the parties; (4) even assuming breach, the E&EE payments were grounded in the Berty and Nilles reports determining the end of the restoration period; and (5) bad faith does not flow from enforcement of the Policy. (Docs. 28, at 20-25; 51, at 14).

In response, plaintiff states that defendant had no reasonable basis to deny two of plaintiff's claims. Plaintiff points to a claim under Coverage D for the Dairy Complex repairs, which plaintiff alleges was underpaid by $1,406,370.07; and a claim under the E&EE Coverage, which plaintiff alleges was underpaid by $2 million. (Docs. 2, at 10-11; 43, at 27).

### a. Defendant Did Not Breach the Policy

As discussed *supra*, there is a genuine issue of material fact as to whether defendant breached the Policy. Therefore, the absence of a breach may not be assumed at this summary judgment stage, and this argument does not weigh in favor of defendant.

### b. Reasonable Basis for Denying Coverage D Payments

Defendant claims that, even assuming breach, there was a reasonable basis upon which to deny additional payments under Coverage D because such denial was based on the findings of the Nilles Report. (Doc. 28, at 22-23). That the Nilles Report is an expert report appears to be in dispute, given plaintiff's protestation of defendant referring to Nilles as an expert. (Docs. 24-1, at 2; 41-2, at 2). Neither party disputes, however, that he is at least an insurance consultant and valuation specialist whose job includes

creating these reports and journals. In *Van Gelder v. Adams Mut. Ins. Ass'n*, the Iowa Court of Appeals upheld a district court's grant of summary judgment for defendant insurer on a bad faith claim when insurer's denial was based on the report of an insurance investigator. No. 09-0402, 2009 WL 5126109, at *3 (Iowa Ct. App. Dec. 30, 2009) ("[A]n insurance investigator had inspected the home and gave the opinion . . . and this gave [insurer] a reasonable basis for its action.").

Plaintiff claims that "none of the arguments that [defendant] has advanced justify its refusal to pay [the] amounts where properly and clearly due." (Doc. 43, at 28). What plaintiff does not do, however, is cite to items in the record that support this proposition—that is, why the Nilles Report does not form a reasonable basis upon which defendant could have denied plaintiff's claims, though it is plaintiff's burden to do so. Plaintiff cites *Chadima v. Nat'l Fidelity Life Ins. Co.*, which itself says that when "a claim is 'fairly debatable,' the insurer is entitled to debate it" and discusses the requirement that the insured produce evidence upon which a jury could find that plaintiff was entitled to judgment in its favor. 55 F.3d 345, 347, 349 (8th Cir. 1995). Thus, because it has cited no evidence to support this assertion, plaintiff has not shown a genuine issue of material fact as to its unreasonable basis for denial claims made under Coverage D.

### c. *Coverage E Payments were Reasonable*

Defendant also asserts it had reasonable bases when it made and denied payments under Coverage E. (Doc. 28, at 23-24). In support, defendant points to the fact that it worked with plaintiff in valuing certain claims, such as the first payment for cows. (*Id.*, at 23). Together, the parties valued each cow at $1,700, and the September 16, 2020 payment covered the first cow payment excluding salvage value. (*Id.*). Later payment for the remaining 66 deceased cows was also configured based on the $1,700 value and excluded the salvage amount. (*Id.*). Defendant also asserts that after plaintiff asked for $15,000 for the deceased bull, plaintiff was paid $15,000 for the bull loss. (*Id.*). As to

34

the September 28, 2020 payment, Hasz emailed plaintiff asking for review of certain items, such as bunker tires and portable gates, and proposed payments for those items, to which plaintiff told defendant that it agreed with those payment numbers—"[t]hat works for us"—even marking "[g]ood" next to each item it agreed was adequately priced. (*Id.*; 24-3, at 38-42). Defendant also points to the fact that it paid $257,694.50 for silage feed based on numbers from plaintiff, a majority of which came directly from plaintiff in an email sent on November 10, 2020, and the rest of the calculation coming from other numbers plaintiff provided. (*Id.*, at 23-24). Finally, defendant's last Coverage E payment was based on invoices plaintiff placed in its spreadsheet listing damages to the Property. (*Id.*, at 24).

Defendant also supports its assertion that it reasonably denied coverage because it based many of its payments on information and correspondence with Paul Nilles. (*Id.*, at 24; 24-4, at 13-14). Defendant meets its burden here in providing legitimate reasons for its decision to deny claims and issue payments in the amounts it issued them under Coverage E.

Plaintiff once again does not cite to items in the record that support the proposition that defendant did not form a reasonable basis upon which it denied plaintiff's claims under Coverage E. In fact, plaintiff does not mention the Coverage E payments and denials in its resistance. Thus, it has failed to show a genuine issue of material fact as to the Coverage E coverage denials.

### d. Reliance on Experts for Extra Expense Computation

Defendant next asserts that in calculating and denying claims under E&EE Coverage, it relied on the opinions of Nilles and Berty. (Doc. 28, at 24). It cites to the fact it relied on Nilles in determining when the Property was restored adequately under the Policy and determined the Restoration Period based on Nilles reports. (*Id.*). Nilles informed defendant when the Loafing Barns were finished and operational, and he had

attributed the delays in repairs and replacements to the Property to elective enhancements plaintiff made to the Property, which defendant relied upon. (*Id.*). Defendant previously expressed to plaintiff that use of Nilles' reports based on his visits was how defendant determined the Restoration Period. (*Id.*).

Also, defendant points to the fact it used Berty to formulate various indemnity calculations. (*Id.*, at 24-25). Both parties initially worked with Berty to determine methods for calculating revenue, costs, and fluctuations and agreed upon a rolling release of payments to plaintiff. (*Id.*, at 25). Based on this agreement, Berty put three reports together, defendant issued payments equal to each report, and then defendant asked Berty any questions plaintiff had to ensure direct communication with the accountant and plaintiff. (*Id.*). It states that all these facts show it relied on its experts and had a reasonable basis for issuing the amounts it did under E&EE. (*Id.*).

Plaintiff argues defendant lacked a reasonable basis to deny the E&EE Coverage when it allegedly underpaid around $2,000,000. (Doc. 43, at 29). In support, it argues that because Nilles is a construction consultant who did not previously have experience doing dairy industry construction consulting, defendant's reliance on Nilles' opinions and reports did not give a proper basis for denials under E&EE Coverage. (*Id.*, at 29-30). This one fact—that Nilles did not have experience in dairy industry construction—is insufficient alone to carry plaintiff's burden. Plaintiff has not provided evidence showing that Nilles' lack of specific experience in dairy construction made him unqualified to perform the work. More important, plaintiff has not pointed to anything in the record showing that defendant knew or should have known that Nilles' lack of specific experience in dairy construction rendered his judgment and opinions suspect. The record includes evidence that Nilles and Berty provided defendant with updates, reports, and numbers upon which to issue payments, working with plaintiff at times to establish what the reports and numbers would include. There is evidence Berty was qualified as a CPA

to formulate these numbers, which defendant relied on, which is material here, and which plaintiff does not challenge. Also, Nilles was an experienced construction consultant whom defendant believed—and plaintiff presents no evidence defendant did not believe —was qualified to assess the claim here, even if Nilles was not qualified. "[A]n improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254-55 (Iowa 1991). The only question here is whether it was reasonable for an insurer's agent to believe its construction consultant was a reliable source upon which to base denials and payments related to construction performed on the Property, regardless of whether having Nilles investigate was improper. Plaintiff has presented no evidence to create a genuine issue as to whether Nilles was so obviously unqualified[8] to perform dairy construction consultation work that no reasonable basis for denial could have existed.

Were it so obvious to the Court that Nilles was unqualified—if he were a metallurgical engineer or an English teacher or a bicycle mechanic whom defendant employed to assess a construction claim—or had plaintiff provided evidence other than the one fact it provided, the Court may have found plaintiff meets its heavy burden. However, plaintiff does not, without more, show a genuine issue that reliance on Nilles and Berty in denying claims and issuing payments was unreasonable. Thus, there is no genuine issue as to whether reliance on Nilles and Berty created a baseless denial.

---

[8] This is not to say these facts could not exist at all, as the Court acknowledges many professions have sub-specialties, including construction. The Court simply finds plaintiff has presented no evidence that reliance on Nilles' opinions was so obviously unreasonable, as it has cited nothing indicating or explaining why lack of dairy building experience makes him wholly unreliable and the decisions baseless.

### e. Bad Faith does Not Flow

Defendant asserts enforcing the provisions of an agreement—the Policy—is not bad faith and does not create a lack of basis for denial of claims. (Docs. 28, at 25; 51, at 14). In support, it points to the one-year provision and cites caselaw holding that just because the parties dispute the consequences of an undisputed fact—the Policy provisions—does not automatically equal bad faith by the insurer. (*Id.*). *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 474 (Iowa 2005). It also points to evidence it consulted Nilles when plaintiff made its June 28, 2021 request, and it only denied the request after Nilles stated that the items referenced in the request would not prohibit use of the structure, so the one-year limit did not need to be waived. (*Id.*). Thus, defendant says it had a reasonable basis to deny the claims, even if reasonable minds could differ, because there is evidence in existence justifying the denial. (*Id.*).

Plaintiff argues defendant committed bad faith because it invented the one-year provision and attempted to force plaintiff to settle. (Doc. 43, at 30). Plaintiff points to correspondence and discussions with defendant where defendant informed plaintiff it was obligated to finish all repairs within one year of the date of loss and later provided a settlement offer of less than it was owed just before the "deadline" occurred. (*Id.*). Plaintiff cites in support caselaw stating that when there is a claim an insurer knows to be valid that the insurer refuses to pay, or that it deliberately misleads, deceives, or oppresses the insured about recovery for, then there is bad faith. (*Id.*). Plaintiff asserts that defendant's behavior must have been deceptive because after the lawsuit was filed, defendant issued a payment exceeding $500,000 later in the week. Further, plaintiff notes that the Iowa Insurance Commissioner issued a statement that "[g]iven the varied circumstances leading to delays around the derecho recovery, invoking contractual provisions prohibiting payment of recoverable depreciations after a certain deadline may be viewed as a failure to act in good faith[.]" (*Id.*). Plaintiff maintains that it tried to

repair and rebuild the Property as quickly as possible and relied on defendant's assurances defendant would cover the work costs. (*Id.*, at 31). Plaintiff argues that because of the Commissioner's statements and its attempts to be expeditiously rebuilding, surely defendant had no reasonable basis to deny its claims. (*Id.*).

Even if defendant was incorrect about the one-year provision, there is no evidence that provision interpretation was not defendant's actual interpretation of the Policy. Further, it denied the request only after referring to Nilles who was investigating and documenting progress on the rebuild to ensure the Property was commensurate to pre-derecho conditions. Whether this assessment by Nilles was correct, there is evidence defendant, in good faith, relied on what it perceived as an expert assessment so as to not deprive plaintiff of any claims that had to be paid. Defendant also granted extensions to cover items it believed were necessary to put the Property in the state or similar state as it was pre-derecho. Even with the Commissioner's statement, defendant claims it believed, in reliance on Nilles, that the Property was repaired. Here, there is a disputed interpretation, which alone is not enough to show bad faith. Plaintiff has not pointed to any evidence that defendant fabricated its belief in the time limit, nor to any evidence that defendant was aware that the claims after the Restoration end date were covered by the Policy and thus still valid or valid at all—in fact the belief in the year limit indicates defendant lacked knowledge the claims could be made. Plaintiff has only pointed to the fact that defendant wished to settle for a lower amount than plaintiff, claiming with no evidence of this fact that defendant tried to oppress plaintiff to take a settlement offer, and that defendant paid plaintiff after the lawsuit commenced. The checks issued after the lawsuit was filed, however, were allegedly for outstanding payments from claims made during the period allowed, and plaintiff points to nothing indicating otherwise, simply claiming in its exhibits that defendant underpaid the claim. (Doc. 41-7, at 9).

Plaintiff has not pointed to material evidence creating a genuine issue as to whether bad faith was the basis of coverage denials and payments.

Thus, because plaintiff has failed to meet its burden on every theory of this element, no reasonable jury could find in its favor, and summary judgment is appropriate.

### 3. Can Plaintiff Show Defendant Knew or Should have Known its Denial was Baseless

Second, a reasonable jury could not find that the evidence shows defendant knew or should have known its denial was baseless.

Defendant states it had no reason to believe it was baselessly denying the claims because it relied on its understanding of the Policy, belief that some enhancements were elective and not covered, and on reliance of expert opinions and reports created throughout the entire claim process. (Doc. 24, at 2). It points to the fact it had a reasonable basis to deny the claims because it relied on the aforementioned things, but even if it did not have a reasonable basis, it lacked knowledge of unreasonableness, and plaintiff has not cited evidence showing otherwise. (*Id.*).

Plaintiff asserts defendant knew it lacked a reasonable basis in denying each claim. It claims this is "facially apparent from [defendant's] nonsensical arguments" defending each denial. (Doc 43, at 31). In support, it states plaintiff provided defendant with photos it states show that Nilles' opinions were incorrect, so defendant had no reason to deny the claims, and the photos conclusively establish defendant knew the denials were baseless. (*Id.*, at 31-32).

Again, plaintiff points to no material evidence that could lead a reasonable jury to find defendant knew the claim denials were baseless. It cites *Bellville*, stating that "[a]n insurer's negligent or sub-par investigation or evaluation of a claim is relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis," but it fails to acknowledge the following sentence: "But 'an improper

investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" 702 N.W.2d at 475 (citation omitted). Defendant relied on its consultant's opinions, believing him a qualified expert, when denying the claims. There is nothing to suggest defendant knew, or should have known, of any baseless denials. The evidence here could only lead a jury to conclude defendant subjectively believed the rate at which the Property was being rebuilt was different from plaintiff's perceived rate, as were the parties' beliefs about the sufficiency of certain repairs in rebuilding the Property, even after looking at the same pictures. Without evidence supporting defendant's knowledge or what it should have known based on willful ignorance, actual knowledge, or obviousness, plaintiff cannot and has not satisfied its burden.

The Court finds that the undisputed facts could not support a jury finding that defendant knew or should have known its denial was baseless.

For these reasons, the Court **grants** summary judgment as to plaintiff's claim of insurer bad faith.

## IV. CONCLUSION

For these reasons, defendant's motion for summary judgment (Doc. 24) is **denied** as to plaintiff's claims for breach of contract (Count I) and **granted** as to bad faith (Count II).

**IT IS SO ORDERED** this 29th day of November, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

41